# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### GREENEVILLE

SANDRA L. SHORT                          )
                                         )
V.                                       )          NO. 2:14-CV-247
                                         )
CAROLYN W. COLVIN,                       )
Acting Commissioner of Social Security   )

## REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. The Plaintiff's application for disability insurance benefits under the Social Security Act was denied by the Commissioner following a hearing before an Administrative Law Judge ["ALJ"]. This is an action for judicial review of that final decision. The Plaintiff has filed a Motion [Doc. 12] for Judgment on the Pleadings and the Defendant Commissioner has filed a Motion for Summary Judgment [Doc. 17].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*,

745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

The Plaintiff was 35 years old at the time of her alleged disability onset date of August 1, 2010. She has a high school education. No one disputes that she cannot return to any of her past relevant work. Her medical history is summarized in the Commissioner's brief as follows:

> Beginning prior to Plaintiff's alleged onset date through December 2011, Plaintiff's primary care physicians at Mountain State Medical Group prescribed medications to treat her fibromyalgia, migraines, anxiety, and depression (Tr. 255-85, 401-03). Her physical and mental examinations were generally normal (Tr. 257, 259-60, 264, 274, 279-80, 282, 285, 403).
> Christopher Morris, M.D., a rheumatologist with Arthritis Associates of Kingsport, treated Plaintiff's fibromyalgia and Familial Mediterranean fever (Tr. 246). In August 2010, she was diffusely tender in all fibromyalgia points and joints (Tr. 250). She was still having headaches (Tr. 250). She reported being let go from work because of her speed (Tr. 251). In October 2010, she had to decrease Lyrica because of insurance issues and felt better at the lower dose (Tr. 253). Her other medications were continued (Tr. 253). She was looking for another job (Tr. 253).
> Three months later, in January 2011, Plaintiff reported a fibromyalgia flare for two weeks with pain from head to toe (Tr. 239). She was sleeping better (Tr. 239). Dr. Morris added Lexapro (Tr. 239), and Plaintiff reported that it helped her sleep "like a rock" (Tr. 241). Her pain did not get any worse after decreasing Lyrica (Tr. 241).
> At her next follow-up appointment with Dr. Morris in April 2011, Plaintiff was concerned that she had lupus (Tr. 242), which she reiterated at her June 2011 examination (Tr. 243). Dr. Morris told Plaintiff that he did not find anything on examination or in the laboratory results that would support such diagnosis (Tr.

2

243). Plaintiff reported problems with memory and cognitive dysfunction (Tr. 243). She did not want to restart Lyrica due to possible weight gain (Tr. 243). Her antinuclear antibodies (ANA) were weakly positive, but all specific laboratory tests for autoimmune disorders were negative (Tr. 243). Upon physical examination, Plaintiff had no synovitis, a full range of motion in her hands, and her wrists and elbows were stable (Tr. 243). She was "tender at multiple FM points, not controls" (Tr. 243).

In August 2011, Plaintiff told Dr. Morris she had pain in her feet, ankles, knees, hips, legs, and arms (Tr. 245). Her medications were effective at controlling her anxiety and depression (Tr. 245). Her sleep was non-refreshing and it took her a long time to fall asleep (Tr. 245). In September 2011, Plaintiff complained to Dr. Morris of fatigue and insomnia (Tr. 406). Upon physical examination, Plaintiff's hands were puffy and she was tender in multiple joints and had two to three plus tender fibromyalgia points (Tr. 406). At her appointment in November 2011, Plaintiff had multiple tender points and was diffusely tender throughout (Tr. 408). Dr. Morris assessed Familial Mediterranean fever, fibromyalgia, and joint pain (Tr. 408).

In November 2011, Krish Purswani, M.D., performed a physical consultative examination of Plaintiff (Tr. 179-83). Plaintiff reported a 3.5-year history of fibromyalgia and a 10-year history of joint pain (Tr. 179). She also reported pain in her knees, elbows, ankles, and fingers; poor concentration, poor memory, and poor sleep; and chronic fatigue (Tr. 179). She had been diagnosed with Familial Mediterranean fever in June 2011 that resulted in fever, diarrhea, nausea, and abdominal pain, but she had no current symptoms (Tr. 180). Upon physical examination, Plaintiff was comfortable and in no apparent distress (Tr. 181). Her gait and station were normal and she did not use any assistive devices (Tr. 181). Her musculoskeletal and extremity examinations were normal, with normal range of motion and no tenderness (Tr. 181-82). Dr. Purswani assessed joint pain, fibromyalgia, low back pain, sporadic neck pain, shortness of breath, urinary frequency, low potassium, Familial Mediterranean fever, hypertension, and tobacco abuse (Tr. 182). He opined that during an 8-hour workday, Plaintiff could frequently lift 40 pounds two-thirds of the time and could stand, walk, and sit for at least 6 hours (Tr. 182-83).

Also in November 2011, Laura Tugman, Ph.D., performed a psychological consultative examination of Plaintiff (Tr. 362-66). Dr. Tugman noted that Plaintiff had good hygiene and grooming, wore makeup and jewelry, and had styled hair (Tr. 362). Upon mental status examination, Plaintiff's abstract thinking and concentration were mildly impaired (Tr. 364). Her judgment and crystallized knowledge were intact (Tr. 364). Her thinking pattern was well-organized and she had no difficulty maintaining a logical and coherent train of thought (Tr. 365). Her affect was euthymic (Tr. 365). Rapport was easily established (Tr. 365). Her speech and eye contact were good (Tr. 365). Plaintiff reported that she performed daily chores, including loading a dishwasher, making a bed, light house work, and some laundry (Tr. 366). She required assistance with housecleaning that involved

3

bending, mopping, and sweeping (Tr. 366). Her leisure activities included crossword puzzles, reading, caring for her pets, and frequent contacts with family and friends (Tr. 366). Dr. Tugman assessed major depression with depressive disorder, moderate, recurrent and panic disorder without agoraphobia (Tr. 366). She opined that Plaintiff appeared fully capable of understanding simple, detailed, and complex information or directions and put it to full use in a vocational setting (Tr. 366). Her ability to comprehend and implement multi-step complex instructions was mildly impaired due to memory problems (Tr. 366). Her ability to maintain concentration and persistence on tasks for a full work day and work week was moderately impaired due to her reported bouts of memory problems and decreased concentration from pain (Tr. 366). Her social relationships were mildly impaired due to social isolation and her inability to get out and visit due to physical illness (Tr. 366). Charlton Stanley, Ph.D., supervising psychologist, signed Dr. Tugman's report (Tr. 367-68).

In December 2011, Nathaniel Robinson, M.D., a State agency medical consultant, opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently and could stand, walk, and sit for about 6 hours during an 8-hour workday (Tr. 353). He opined that she could occasionally climb, balance, stoop, kneel, crouch, or crawl (Tr. 354). She had no other limitations (Tr. 355-56). His opinion was based on the review of the medical evidence and a finding that Plaintiff's complaints appeared partially credible (Tr. 357).

Eugene Fleece, Ph. D., a State agency psychological consultant, opined in January 2012, that Plaintiff had moderate restrictions in activities of daily living; mild difficulties in maintaining social functioning; and moderate restrictions in concentration, persistence, and pace (Tr. 380). He found Plaintiff's allegations of anxiety and depression to be credible (Tr. 382). He opined that she was moderately limited in her ability to maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and respond appropriately to changes in the work setting (Tr. 384-85). He opined that she was not significantly limited in any other work area related to understanding and memory, sustained concentration and persistence, social interaction, or adaptation (Tr. 384-85). He opined that Plaintiff could concentrate on simple, repetitive tasks for two hour periods and if given routine breaks, could make an eight hour day (Tr. 386). She may ask for some supervisory flexibility in work hours and scheduling, but could still remain within competitive limits (Tr. 386). Initially, if she were assigned to work in very close proximity to numerous others, she may show some irritable distractibility, but the effect would fade with exposure (Tr. 386). She would miss a day of routine duties some months due to her psychological disorders (Tr. 386). Her contacts with the general public should

be held to the brief, infrequent, and superficial (Tr. 386). She could easily cope with workplace changes that were simple, well-explained or implemented gradually (Tr. 386).

In December 2011, Plaintiff told Dr. Morris that she continued to have flares and that her medications were not helping as much (Tr. 410). She was not sleeping well (Tr. 410). She had recurrent problems with her bowels and lots of nausea (Tr. 410). Upon physical examination, she had good range of motion in her upper extremities (Tr. 410). She was tender at multiple fibromyalgia points (Tr. 410).

The next month, in January 2012, Plaintiff told Dr. Morris that she had noticed a big difference since starting Kineret to treat her Familial Mediterranean fever (Tr. 412). Her pain was not as bad and she had only one mild flare of bowel problems (Tr. 412). She had not had swollen joints (Tr. 412). Her energy level was still not great (Tr. 412). She reported that she had been "overdoing it" because she felt like doing things (Tr. 412). Upon physical examination she had multiple tender joints and was diffusely tender throughout (Tr. 412). Dr. Morris noted that Plaintiff's significant improvement on Kineret provided evidence that she should be maintained chronically on that medication (Tr. 413).

At her follow-up appointment in March 2012, Plaintiff reported that Kineret continued to really make a difference in her symptoms and that she only had three flares since starting the medication (Tr. 414). Her sleep had improved (Tr. 414). Her physical examination was normal (Tr. 414). Dr. Morris continued her medications (Tr. 415).

Plaintiff sought a new primary care physician in February 2012 (Tr. 419). Upon physical examination in March 2012, Plaintiff reported lumbar pain radiating to her right leg with tenderness (Tr. 417). A view of her lumbar spine in March 2012 showed bilateral L4-L5 and L5-S1 facet arthropathy with mild degenerative disc disease at the L5-S1 disc level (Tr. 453).

In May 2012, Jenaan Khaleeli, Psy.D., a State agency psychological consultant, evaluated Plaintiff's claim on reconsideration and affirmed the previous finding regarding her mental impairments (Tr. 425). Also in May 2012, Michael Ryan, M.D., a State agency medical consultant, evaluated Plaintiff's claim on reconsideration and affirmed the previous finding regarding her physical impairments (Tr. 427).

In June 2012, a magnetic resonance imaging (MRI) scan of Plaintiff's lumbar spine had shown right foraminal disk protrusion and bilateral facet arthropathy of the L5-S1 level with right sided foraminal stenosis, minimal disk bulge, and bilateral facet arthropathy of the L4-L5 disk level with some minimal bilateral foraminal spinal stenosis (Tr. 452). That month, Plaintiff told Dr. Morris that her medications were helping and she had increased her activity (Tr. 474).She said she would tend to "overdo it and then crash." (Tr. 474). Upon physical examination, she was tender and full across multiple joints and had tender fibromyalgia points (Tr. 474).

In August 2012, Plaintiff reported three to four flare-ups since her last

visit (Tr. 472). Dr. Morris assessed Raynaud's syndrome (Tr. 472). She was tender and full across multiple joints and had two plus tender fibromyalgia points (Tr. 472). In October 2012, she told Dr. Morris that she was doing quite well (Tr. 470). Although she still had some pain, she had experienced a big reduction in flares and had much less gastrointestinal upset (Tr. 470). Her physical examination was unchanged (Tr. 471).

In November 2012, Plaintiff sought treatment from Pain Medicine Associates (Tr. 445-46). Upon physical examination, Plaintiff had significant fibromyalgia trigger points (Tr. 445-46). Her sensation, strength, and reflexes were normal (Tr. 446). Her mental status examination was normal (Tr. 446). Benjamin Meeks, a nurse practitioner, recommended exercise, sleep, nicotine cessation, and dietary modification to manage her fibromyalgia (Tr. 446, 460). At her follow-up appointment in December 2012, Plaintiff told Mr. Meeks that she had pain in her joints and muscles (Tr. 454). He gave her an epidural steroid injection in her low back and some lidocaine patches for her back pain (Tr. 454).

Also in December 2012, Plaintiff told Dr. Morris that Kineret helped her symptoms and that her flares were down to one to three times per month, although she continued to experience daily pain (Tr. 468). Upon physical examination, Plaintiff's joints were hypermobile and she had two plus tender fibromyalgia points (Tr. 468). Her examination in February 2013 was unchanged (Tr. 465-66).

In March 2013, Plaintiff told Mr. Meeks that she was only experiencing diffuse pain in her low back and that the pain patches helped (Tr. 455). Upon physical examination, she had increased pain with extension of her lumbar spine (Tr. 455). Mr. Meeks recommended aquatic therapy for her fibromyalgia symptoms and prescribed topical gel for her diffuse muscle aches and pains (Tr. 456).

In May 2013, Plaintiff had a severe flare of her Familial Mediterranean fever which lasted for more than a week (Tr. 463). She reported difficulty doing light house work and self-care (Tr. 463). The topical gel and patches helped, as did the injections (Tr. 463). She was tender upon physical examination (Tr. 464).

[Doc. 18, pgs. 3-10].

At the administrative hearing on June 7, 2013, in addition to having the testimony of the Plaintiff, the ALJ took the testimony of Dr. Robert Spangler, a vocational expert ["VE"].  He first asked the doctor to assume the Plaintiff had the physical residual functional capacity set out in Exhibit 10F, the physical capacity assessment of Dr. Nathaniel Robinson, M.D. (Tr. 352-360).  When asked if there were jobs which a person

could perform with those physical capabilities, Dr. Spangler stated there were 8,923,517 jobs in the United States and 188,140 in Tennessee, less 30% for the postural limitations in Exhibit 10-F, which the person could perform. These jobs included cashier (the most jobs with 23,000 at "restaurants and gas stations"), food preparation, cafeteria line worker, light maid, non-farm animal care, retail sales, interviewer, and general office clerk. (Tr. 59-60).

The ALJ then asked Dr. Spangler to continue to assume those facts but to also assume the person "has the (INAUDIBLE) limitations as set forth in Exhibit 13F, which is the mental residual functional capacity completed by (INAUDIBLE). Are you familiar with this exhibit?" Dr. Spangler responded that he was. The ALJ then asked "[w]hat impact, if any, would these limits have upon the jobs you identified in hypothetical number one?" The VE responded "[w]ell, 13F uses the definition of moderate or satisfactory so it wouldn't have any impact." (Tr. 60-61). Finally, the VE opined that if the Plaintiff's testimony was credible and reliable, there would be no jobs because of her episodes roughly twice a week in which she testified she had to use the restroom more than once each hour and suffered from chronic fatigue. (Tr. 61-62).

On July 26, 2013, the ALJ rendered his hearing decision. He found that the Plaintiff suffered from severe impairments of osteoarthritis, fibromyalgia, depressive disorder, and panic disorder. (Tr. 25). For the next seven pages of the decision, he summarized the Plaintiff's medical evidence and her testimony at the hearing in great detail. (Tr. 25-32). In particular, he set out the findings in in the "Functional Capacity

7

Assessment," which is "Part III" of Exhibit 13F, the opinion of State Agency psychologist Dr. Eugene Fleece, Ph.D, which he referred to in his hypothetical to the VE. He explained that Dr. Fleece "stated that the claimant can concentrate on simple, repetitive tasks for two-hour periods and, if given routine breaks, can make an eight-hour day. He stated the claimant may ask for some supervisor's flexibility on work hours and scheduling, but could still remain within competitive limits. Initially, if the claimant is assigned to work in very close proximity to numerous others, she may show some irritable distractibility, but the effect will fade with exposure. The claimant will miss a day of routine duties some months due to psychological disorder. The psychological consultant stated the claimant's contacts with the general public should be held to brief, infrequent, and superficial. He stated the claimant could easily cope with workplace changes that are simple, well-explained, or implemented gradually." (Tr. 29).

The ALJ then found that the Plaintiff did not have an impairment or combination of impairments which met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 32). In thus evaluating the Plaintiff's mental impairment, he found that she had a mild restriction in activities of daily living, and moderate restrictions in social functioning and with regard to concentration, persistence or pace. (Tr. 32-33).

He then stated his finding of the Plaintiff's residual functional capacity ["RFC"]. He stated she had the RFC "to perform light work…except with occasional postural (climbing, balancing, stooping, kneeling, crouching, or crawling) (consistent with Exhibit

10F). In addition, the claimant can concentrate on simple, repetitive tasks for two-hour periods and, if given routine breaks, can make an eight-hour day; may ask for some supervisor's flexibility on work hours and scheduling, but could still remain within competitive limits; may show some irritable distractibility initially if working in very close proximity to numerous others, but the effect will fade with exposure; will miss a day of routine duties some months due to psychological disorder; contacts with the general public should be held to brief, infrequent, and superficial; and could easily cope with workplace changes that are simple, well-explained, or implemented gradually (consistent with Exhibit 13F)." (Tr. 34-35).

As part of making the RFC finding, the ALJ was required to take into account the Plaintiff's symptoms and whether they were consistent with the objective medical and other evidence. He stated that if the Plaintiff's "statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record." (Tr. 34). In other words, he was explaining his duty to determine the Plaintiff's credibility about her subjective complaints and their intensity. He noted that she stated that her severe impairments were "of the severity, frequency and duration as to prevent the claimant from performing substantial gainful activity." *Id.* He found those statements were "not entirely credible." (Tr. 34). He then recounted her medical treatment with regards to each impairment, including those he did not find severe such as asthma and bladder problems.

9

(Tr. 34-36).

He then stated that after considering all of her subjective complaints, he did not find that Plaintiff had "a medically determinable impairment that would be expected to result in restrictions in the performance of light work." (Tr. 36). He based this upon her "report of actual activities" which included doing light housework, working in her flower bed, caring for pets, driving, reading, visiting and caring for personal needs. He found her daily activities "not limited to the extent one would expect" given her complaints. He noted that her medications had been relatively effective in controlling her symptoms. He stated that no treating source had placed any restrictions on her activities. Thus, he found her complaints of "disabling pain or other symptoms were not credible or supported by the documentary evidence." (Tr. 36).

He gave some weight to Dr. Purswani, but found the claimant more limited in lifting and carrying than Dr. Purswani did because of her degenerative disc disease, low back pain and fibromyalgia. He gave some weight to the consultative psychological examiners, Drs. Tugman and Stanley. He gave some weight to the State Agency physicians even though they were non-examining sources because their findings were consistent with the other objective evidence. He gave great weight to Dr. Robinson, which formed the physical component of his RFC finding. Finally, he gave great weight to Dr. Fleece, the State Agency psychologist, whose opinion was the basis of the mental component of the RFC finding. (Tr. 37).

While the Plaintiff could not perform her past relevant work, the ALJ found that

10

when given his RFC findings, the VE identified jobs described hereinabove. Because this represented a significant number of jobs in the national economy, he found that the Plaintiff was not disabled. (Tr. 38).

Plaintiff raises various assignments of error. She states that the ALJ's RFC finding did not include other limitations such as her frequent requirement to go to the restroom, and incontinence, and that this "failure" of the ALJ's analysis is due to the nature of fibromyalgia which she has, and for which she has been treated. However, the ALJ did recognize the existence of Plaintiff's fibromyalgia, and found it to be her primary physical severe impairment. The symptoms she alleges he did not include in his RFC finding were findings which he did not find to be credible to the extent Plaintiff claims. The ALJ "is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant…" in this regard. *Schmiedebusch v. Comm'r of Soc. Sec.*, 536 F. App'x 637 (6th Cir. 2013). Also, this Court cannot lightly dismiss the ALJ's findings on credibility. He is the trier of fact, and if he gives good reasons for his credibility determination, this Court may not interfere. The ALJ had substantial evidence to support his findings. No treating doctor had placed restrictions on the Plaintiff. She responded favorably to treatment and retained normal gait, strength and reflexes. He found that she had seriously reduced ability to do light work, and factored the objective medical evidence into that finding. The Court finds no error in the physical impairments included in the RFC finding or his finding that the Plaintiff was not entirely credible.

11

The main assignment of error, however, is much more significant. The Plaintiff asserts that it is unclear that the VE, Dr. Spangler, understood or factored in all of the mental limitations which the ALJ meant to impose in his hypothetical question. The difficulty is not with the ALJ's initial question in this regard. As previously stated, he asked what jobs would remain from those identified for a person with Plaintiff's physical capacities if she had "the limitations as set forth in Exhibit 13F." (Tr. 61). It is true that Dr. Spangler stated that he was familiar with Exhibit 13F. However, when asked about the effect it would have on the jobs the Plaintiff could perform, he responded that "13F uses the definition of moderate or satisfactory so it wouldn't have any impact." (Tr. 61). The Court presumes he meant "the definition of moderate *is* satisfactory" in the form Dr. Fleece used. However, the Court cannot agree with the Commissioner that it is clear in the transcript that Dr. Spangler was including the "Functional Capacity Assessment" portion of Dr. Fleece's findings (Tr. 386), which were adopted *verbatim* by the ALJ in his RFC finding (Tr. 33-34). Dr. Spangler's answer suggests he only looked at the first two pages of Dr. Fleece's report (Tr. 384-385), which show "marked" limitations in certain areas of function. The narrative portion in Part III of the form is the "real" functional capacity assessment, and it places severe restrictions on the Plaintiff's capabilities, capabilities included in the ALJ's RFC finding. 13F is unusually intricate in this regard.

For example, it includes a need for "supervisory flexibility on work hours and scheduling," and requires Plaintiff's "contacts with the general public" limited to being "brief, infrequent and superficial." The jobs of restaurant cashier, retail sales clerk and

12

interviewer do not obviously satisfy that criteria of Dr. Fleece's opinion or the ALJ's RFC. All of those jobs appear to require as their main duty frequent contact and interaction with the general public.

The Court is certainly not convinced that the Plaintiff is disabled, but it cannot say that the VE was aware of all of the components of Exhibit 13F. In the opinion of the Court, the Commissioner's finding based on Dr. Spangler's testimony is not substantially justified.

It is therefore respectfully recommended that the case be remanded to the Commissioner for the question to the VE to be "fleshed out" and specify all of the components of the Plaintiff's mental limitations described in Part III of Exhibit 13F. It is therefore respectfully recommended that the Plaintiff's Motion for Judgment on the Pleadings [Doc. 12] be GRANTED, and that the Defendant's Motion for Summary Judgment [Doc. 17] be DENIED. [1]

Respectfully submitted,


_____s/Clifton L. Corker_____
United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).

13